Caroline N. Mitchell (State Bar No. 143124)
cnmitchell@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Yolanda Orozco (State Bar No. 90779)
yorozco@jonesday.com
Angelina E. Chew (State Bar No. 244634)
aechew@jonesday.com
Kara Backus
kbackus@jonesday.com (State Bar No. 260594)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Attorneys for Plaintiff
JOHNIE L. STOCKER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**JOHNIE L. STOCKER,**

**Plaintiff,**

**v.**

**ANTHONY HEDGPETH, Warden, Kern Valley State Prison; SHARON ZAMORA, Health Care Manager, Kern Valley State Prison; N. GRANNIS, Chief of Inmate Appeals, Kern Valley State Prison; A. ALOMARI, Medical Appeals Analyst, Kern Valley State Prison; DAVID SMITH, M.D., Surgeon, CSP - Corcoran Specialty Clinic, JONATHAN AKANNO, M.D., Physician/Surgeon, Kern Valley State Prison; and DOES 1 through 50, inclusive,**

**Defendants.**

**Case No. 1:07-cv-00589-LJO-DLB**

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

**(Statement of Disputed Facts; Response to Defendants' Statement of Undisputed Facts; Declarations of Johnie L. Stocker, Richard C. Rosenberg, M.D., Angelina E. Chew and Exhibits)**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 1

A. Sixty-Seven Day Delay in Treating Mr. Stocker's Dislocated Finger ..... 1

1. March 2006 – Injury and Indifference ..... 1

2. X-ray and Motrin but Nothing Else ..... 3

3. Health Care Services Request Forms That No One Acts Upon ..... 4

4. April 4, 2006 – First Medical Appointment And More Indifference ..... 5

5. The Orthopedic Appointment on April 27, 2006 ..... 6

B. The Unsuccessful First Surgery and Three Additional Months with a Dislocated Finger ..... 7

C. Second Surgery Results in a Deformity, Remaining Options Not Acceptable ..... 9

D. Mr. Stocker's Medical Appeal Was Delayed, Then Ultimately Denied ..... 11

III. SUMMARY JUDGMENT STANDARD ..... 13

IV. LEGAL ARGUMENT ..... 13

Defendants Violated Mr. Stocker's Eighth Amendment Rights ..... 13

A. Mr. Stocker's Dislocated Finger Represented A Sufficiently Serious Medical Need ..... 14

B. Dr. Akanno was Deliberately Indifferent to Mr. Stocker's Serious Medical Need ..... 15

1. *Dr. Akanno's Delay Shows His Deliberate Indifference* ..... 16

a. The Initial Delay: March 5 through April 4, 2006 ..... 16

b. The Second Delay: July 17 through October 31, 2006 ..... 19

c. Dr. Akanno's Delays Caused Serious Harm to Mr. Stocker ..... 21

2. *Dr. Akanno's Blatantly Inappropriate Treatment Shows His Deliberate Indifference* ..... 21

3. *Dr. Akanno's Decision to Ignore Mr. Stocker's Repeated Requests Shows His Deliberate Indifference* ..... 22

C. Dr. Smith was Deliberately Indifferent to Mr. Stocker's Serious Medical Need ..... 23

1. *Dr. Smith's Delay in Following-Up With Mr. Stocker Shows His Deliberate Indifference* ..... 24

a. Dr. Smith's Delays Caused Serious Harm to Mr. Stocker ..... 25

2. *Dr. Smith's Blatantly Inappropriate Treatment Shows His Deliberate Indifference* ..... 25

D. Ms. Zamora was Deliberately Indifferent to Stocker's Serious Medical Need ..... 26

1. *Ms. Zamora's Failed Policies Show Her Deliberate Indifference* ..... 27

**TABLE OF CONTENTS**
**(continued)**

**Page**


2. *Ms. Zamora's Tacit Authorization of a Custom Tolerant of Inadequate Medical Care Shows Her Deliberate Indifference* ................. 28

3. *Ms. Zamora's Failure to Train Her Subordinates Shows Her Deliberate Indifference* ................. 29

4. *Ms. Zamora's Failure to Ensure that Mr. Stocker's Appeal was Handled in a Timely Manner Shows Her Deliberate Indifference* ........... 30

V. CONCLUSION ................. 31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .... 13

*Berg v. Kincheloe*, 794 F.2d 457 (9th Cir.) .... 15, 25, 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .... 13

*City of Canton v. Harris*, 489 U.S. 378 (1989) .... 30

*Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) .... 30

*Estelle v. Gamble*, 429 U.S. 97 (1976) .... 14

*Farmer v. Brennan*, 511 U.S. 825 (1994) .... 14

*Greeno v. Daley*, 414 F.3d 645 (7th Circuit. 2005) .... 15, 22, 25

*Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989) .... 27

*Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir.1994) .... 22, 25

*Jackson v. McIntosh*, 90 F.3d 330 (9th Cir. 1996) .... 22

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006) .... passim

*Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003) .... 26

*McGuckin v. Medlen*, 974 F.2d 1050 (9th Cir. 1992) .... 15

*Plemmons v. Roberts*, 439 F.3d 818 (8th Cir. 2006) .... 30

*Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir. 1991) .... passim

*Scicluna v. Wells*, 345 F.3d 441 (6th Cir. 2003) .... 15, 16, 24

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) .... 14

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) .... 30

*Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987) .... 27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Toguchi v. Chung*,
391 F.3d 1051 (9th Cir. 2004) ... 14

*Wood v. Housewright*,
900 F.2d 1332 (9th Cir. 1990) ... 16

**Statutes**

42 U. S. C. § 1983 ... 13

Cal. Gov't Code § 845.6 ... 1

**Rules**

Fed. R. Civ. P. 56(c) ... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff Johnie L. Stocker suffered a simple dislocation to his left ring finger while playing basketball at Kern Valley State Prison ("Kern Valley"). Despite the routine nature of the injury, he was made to wait over two months for medical treatment of that injury. When the first procedure failed and his finger became dislocated again, he was forced to wait for three months until a surgical procedure was performed. These delays occurred despite the unanimous view of the doctor defendants that dislocations must be promptly treated to ensure proper healing. Ultimately, neither treatment was effective. Mr. Stocker has lost substantial use of his left hand and lives with a permanent deformity.

The evidence establishes a clear violation under the Eighth Amendment; at a minimum, this evidence raises disputed issues of fact which preclude summary judgment. To determine whether Defendants Jonathan Akanno, M.D., David Smith, M.D., and Sharon Zamora (collectively, "Defendants") violated Mr. Stocker's Eighth Amendment right to be free from cruel and unusual punishment, the Court must consider whether they were (i) deliberately indifferent to (ii) Mr. Stocker's serious medical needs. Defendants do not contest the seriousness of Mr. Stocker's injury and his need for treatment. Further, viewing the facts in a light most favorable to Mr. Stocker, there exists a triable issue of fact as to whether the extreme and pervasive delay in providing medical care at Kern Valley in 2006, and the failure of medical personnel to fulfill their duties to treat an injury they knew to exist, amount to deliberate indifference under this standard.[1]

## II. STATEMENT OF FACTS

### A. Sixty-Seven Day Delay in Treating Mr. Stocker's Dislocated Finger

#### 1. March 2006 – Injury and Indifference

On the afternoon of March 5, 2006, Mr. Stocker dislocated his left ring finger while playing basketball at Kern Valley. [Plaintiff's Statement of Disputed Facts, No. 2.][2] The finger

[1] Mr. Stocker will dismiss his cause of action under Government Code Section 845.6 prior to the hearing on Defendants' motion.

[2] Hereafter, the Plaintiff's Statement of Disputed Facts will be referred to as "Sep. Stmt.," followed by citations to the appropriate paragraph number(s).

immediately swelled and was very sensitive and painful. [Sep. Stmt., No. 3.] That same day, Mr. Stocker went to the medical clinic located on the A Yard ("A-Yard Clinic"), where he was housed, to have the finger treated or reset. [Sep. Stmt., No. 3.] Defendant and prison doctor, Dr. Jonathan Akanno, testified at his deposition that at all times relevant, he worked in the A-Yard Clinic. [Sep. Stmt., No. 5.] Dr. Akanno also testified that doctors assigned to the A-Yard Clinic see patients there daily, usually in the morning and early afternoon. [Sep. Stmt., No. 5.] On the day Mr. Stocker visited the A-Yard Clinic after he dislocated his finger, there was no doctor present at the clinic. [Sep. Stmt., Nos. 3-4.] The nurse on duty told Mr. Stocker that it was too late in the day to be treated, and that he would be called back to the clinic in the morning for treatment. [Sep. Stmt., No. 4.] In his presence, the nurse made a phone call to the Correctional Treatment Center ("CTC"), which is the larger clinic servicing the whole prison, and described the injury. [Sep. Stmt., No. 3.] Before Mr. Stocker was sent back to his cell, the nurse splinted the finger, but did not attempt to reset the dislocation. [Sep. Stmt., No. 3.]

In the evening of the same day that Mr. Stocker dislocated his finger, March 5, 2006, Dr. Akanno was contacted via telephone and informed that Mr. Stocker had dislocated his finger. [Sep. Stmt., No. 6.] Dr. Akanno gave a telephonic order to the effect that Mr. Stocker's finger should be splinted, the hand elevated, and that Mr. Stocker should be seen by a nurse the next morning "so that he could be referred for the appropriate treatment." [Sep. Stmt., No. 7.] Dr. Akanno also prescribed two doses of Motrin 400 mg. [Sep. Stmt., No. 7.] The *next day*, March 6, 2006, Dr. Akanno signed the telephonic order written up by the nurse the night before. [Sep. Stmt., No. 8.] Although Dr. Akanno has admitted that his responsibility for Mr. Stocker's injury did not end after giving the telephonic order, he did nothing to determine whether Mr. Stocker received any care for the dislocation on March 6, or in the weeks following, and did not follow-up with Mr. Stocker himself**.** [Sep. Stmt., Nos. 9, 12.]

No one from the clinic called for Mr. Stocker on March 6, but his floor officers allowed him to go to the A-Yard Clinic on his own. [Sep. Stmt., No. 13.] It was obvious to them that the swollen, bruised and crooked finger needed medical attention. [Sep. Stmt., No. 13.] Despite Dr. Akanno's testimony that he sometimes sees unscheduled "walk-in" patients at the clinic and has

reset finger dislocations before, Mr. Stocker was turned away by A-Yard Clinic staff without any treatment the day after the injury. [Sep. Stmt., Nos. 11, 15.] In fact, for the next week, Mr. Stocker returned to the clinic on an almost daily basis, and sometimes more than once per day, to have someone reset his dislocated finger. [Sep. Stmt., No. 14.] Mr. Stocker was in intense pain throughout this time, and his finger was extremely swollen and bruised, yet neither Dr. Akanno nor any medical staff ever summoned Mr. Stocker for care, and each time he went to the clinic, he was turned away without treatment. [Sep. Stmt., No. 14.] During these visits, he sometimes received a fresh splint or some Motrin, but no one attempted to reset the finger or even diagnose the problem. [Sep. Stmt., No. 20.]

Dr. Akanno disclaims any responsibility for scheduling inmates for medical treatment, as if such a disclaimer extinguishes his obligations as a physician. However, Dr. Akanno admits that he sometimes sees patients on a "walk-in" basis without scheduled appointments, and that he saw Mr. Stocker without an appointment on at least one occasion. [Sep. Stmt., Nos. 15, 51.] Plaintiff's orthopedic expert is of the opinion that on the night Dr. Akanno learned of Mr. Stocker's injury, March 5, and prescribed a course of treatment, he became Mr. Stocker's doctor with the affirmative obligation to follow-up on Mr. Stocker's status the next day when he signed the telephonic order. It was Dr. Akanno's duty to ensure that Mr. Stocker had been both promptly seen and treated, or to provide such treatment himself. [Declaration of Richard C. Rosenberg, M.D. ("Rosenberg Decl."), p. 3,¶ 5.]

### 2. X-ray and Motrin but Nothing Else

On March 13, 2006, *8 days* after the injury and without ever having been medically treated, Mr. Stocker was transported to the CTC to have an x-ray taken. [Sep. Stmt., No. 17.] The physician's order for that day indicates that the nurse believed Mr. Stocker had a fracture or possible dislocation. [Sep. Stmt., No. 18.] After viewing the films, the x-ray technician confirmed to Mr. Stocker that his finger was dislocated and told him that a doctor would be in to reset the finger. [Sep. Stmt., No. 18.] Mr. Stocker was placed in a holding cell within the CTC to wait for the doctor. [Sep. Stmt., No. 18.] He waited three and a half hours, but no doctor came to correct the dislocation. [Sep. Stmt., No. 18.] Mr. Stocker was then forced to leave the CTC

untreated and return to his cell. [Sep. Stmt., No. 18.]

For the next three weeks, Mr. Stocker resumed his routine of visiting the A-Yard Clinic on nearly a daily basis. [Sep. Stmt., No. 19.] Despite sometimes begging for help, he was never seen by Dr. Akanno or any other medical personnel. [Sep. Stmt., No. 19.] The dislocation was so painful that he could no longer work effectively; the finger remained swollen and crooked. [Sep. Stmt., Nos. 16, 19.] His boss assigned him light-duty tasks that only required one hand. [Sep. Stmt., No. 16.] The staff at the A-Yard Clinic began to expect his visits, and they would simply offer him splints and tape so that he could splint the finger himself. [Sep. Stmt., No. 20.]

On March 14, 2006, Dr. Akanno was contacted by a nurse because Mr. Stocker "needed pain medication for his finger." [Sep. Stmt., No. 21.] Astonishingly, Dr. Akanno approved a stronger Motrin prescription for *ninety-days* without having once examined Mr. Stocker to determine his condition and his need for pain medication. [Sep. Stmt., No. 21.] The new prescription doubled the previous dosage – from 400 mg to 800 mg – yet Dr. Akanno did nothing to inquire about the status of his patient at that time. [Sep. Stmt., No. 21.] Neither did Dr. Akanno review the March 13 x-ray results before issuing the prescription. Dr. Akanno had an affirmative obligation to examine Mr. Stocker before prescribing a stronger pain medication. [Rosenberg Decl., pp. 3-4, ¶ 8.]

By March 14, it had been *nine days* since Mr. Stocker's injury, but he had yet to be seen by a doctor or have the dislocation remedied. [Sep. Stmt., Nos. 20, 21.]

### 3. Health Care Services Request Forms That No One Acts Upon

Health Care Services Request Forms were available to inmates at Kern Valley for the purpose of reporting medical problems and requesting care. [Sep. Stmt., No. 22.] These could be obtained at the A-Yard Clinic or from nurses who made rounds throughout the cell area. Once filled out, the forms could be turned in to a box on the A-Yard or to one of the nurses making rounds. [Sep. Stmt., No. 22.] After nearly a month of enduring constant and severe pain, and without receiving any medical care aside from splints and Motrin, Mr. Stocker began to fill out Health Care Services Request Forms in an attempt to alert medical officials about the seriousness of his injury. [Sep. Stmt., No. 24.; Stocker Decl., p. 3, ¶ 7 & Exhibits 1-11, 13, 15-16.]

Completing the forms rarely, if ever, made any difference, even though Mr. Stocker does remember on at least one occasion that a form was in his file during a visit with Dr. Akanno. [Sep. Stmt., No. 26.] On March 30, 2006, Mr. Stocker filled out a request form *at the A-Yard Clinic* stating that his finger had been dislocated for four weeks and no one had bothered to reset it. [Sep. Stmt., No. 24.] Another four days would elapse before Mr. Stocker would be able to finally see Dr. Akanno. [Sep. Stmt., No. 25.]

Dr. Akanno testified at his deposition that he was not made aware of the complaints raised in the Health Care Services Request Forms, but that forms generally went to the director of nursing so that the complaining inmate could be scheduled for an appointment. [Sep. Stmt., No. 26.] According to Dr. Akanno, sometimes a request form did not make it into a patient's file if the problem could be handled quickly. [Sep. Stmt., No. 23.] And sometimes these request forms would sit in medical records in "loose filing" until "gradually it starts making its way into the respectively [sic] medical records." [Sep. Stmt., No. 23.]

#### 4. April 4, 2006 – First Medical Appointment And More Indifference

Finally, on April 4, 2006, *thirty days* after his dislocation, Mr. Stocker was seen by Dr. Akanno, however this visit did not result in any medical intervention.[3] [Sep. Stmt., Nos. 25, 27.] On that day, the finger was still swollen, crooked, and painful. [Sep. Stmt., No. 28.] Dr. Akanno did not look at the x-ray that had been taken *twenty-two days* prior, which clearly indicated a finger dislocation, nor did he order a new one. [Sep. Stmt., No. 28.] Dr. Akanno merely looked at Mr. Stocker's finger, concluded that the finger was fractured, and simply ordered an orthopedics referral. [Sep. Stmt., Nos. 28-29.] Mr. Stocker's orthopedic expert is clear on Dr. Akanno's affirmative obligation, under the circumstances, "to review the existing x-ray or x-ray report, or to order an x-ray." [Rosenberg Decl., p.4, ¶ 9 & Exhibits C-G.] Dr. Akanno did neither; if he had, he would have realized the finger was dislocated – not fractured – and he might have been able to expedite treatment.

Dr. Akanno marked the orthopedics referral "urgent" because he knew that referrals

[3] Dr. Akanno states in his declaration that "[he] *next* saw plaintiff April 4, 2006…" (emphasis added) [Akanno Decl., pp. 2-3, ¶ 9] In truth, Dr. Akanno saw Mr. Stocker for the *first* time on April 4, a month after Dr. Akanno first learned about Mr. Stocker's dislocated finger.

sometimes took up to two months if they were marked "routine." [Sep. Stmt., No. 29.] Despite the "urgent" referral to orthopedics, Mr. Stocker remained without *any* medical intervention for weeks. [Sep. Stmt., No. 30.] He filled out three Health Care Services Request forms during the month of April 2006. [Sep. Stmt., No. 30; Stocker Decl., p. 4, ¶ 10 & Exhibits 2-4.] In each, he explained that he could not get anyone on the A-Yard Clinic to reset his finger. He pleaded for help.[4] [Sep. Stmt., No. 30.] Mr. Stocker also continued to remind the staff at the A-Yard Clinic that he had not been treated. [Sep. Stmt., No. 30.] *Fifty one* days after his injury, on April 25, 2006, Mr. Stocker saw Dr. Akanno again. [Sep. Stmt., No. 31.] It is no surprise that Mr. Stocker's finger had not improved. It was still dislocated, and remained very painful and swollen. [Sep. Stmt., No. 31.] This time, Dr. Akanno reviewed the x-ray report taken more than *five weeks before*. [Sep. Stmt., No. 31.] He concluded, correctly, that Mr. Stocker's finger was in fact dislocated, and informed Mr. Stocker that he was waiting for him to be scheduled with the orthopedist. [Sep. Stmt., No. 31.]

**5. The Orthopedic Appointment on April 27, 2006**

On April 27, 2006, Mr. Stocker was transported to Corcoran State Prison for his first appointment with defendant Dr. David Smith, the orthopedist. [Sep. Stmt., No. 32.] Dr. Smith, after learning that Mr. Stocker had dislocated his finger on March 5, 2006, and looking at the condition of Mr. Stocker's finger, told him that the finger should have been treated immediately after the injury. [Sep. Stmt., No. 32.] Dr. Smith added that he was unsure whether the finger could be fixed at all because of the delay in resetting it. [Sep. Stmt., No. 35.] Dr. Smith did not medically treat the dislocation on April 27, rather scheduled Mr. Stocker for an open reduction and internal fixation ("ORIF") procedure. [Sep. Stmt., Nos. 33, 35.] This type of operation involves a surgical incision on the finger, removing scar tissue, manipulating the finger bone back into alignment, and placing pins to hold the bone in place. [Sep. Stmt., No. 36.]

On May 11, 2006, *sixty-seven days* after the injury, Dr. Smith finally reduced the

[4] In his April 19, 2006 Health Care Services Request Form, Mr. Stocker wrote: "My finger was dislocated on 3-6-06. I have pleaded with the medical staff to reset the finger but after 6 weeks they have refused me any help except for some tape and wooden sticks. It hurts very bad."

dislocation in Mr. Stocker's finger. [Sep. Stmt., No. 37.] However, although Dr. Smith performed a procedure on Mr. Stocker's finger, it was not the ORIF. [Sep. Stmt., No. 37.] Dr. Smith testified at his deposition that he discovered during the procedure that he could reduce the dislocation and place pins without surgically opening the finger (this is called a "closed reduction"). [Sep. Stmt., No. 37.] No one informed Mr. Stocker of this change in the plan: he discovered there had not been an incision only after he'd returned to his cell and removed the bandage. [Sep. Stmt., No. 38.] During the procedure, Dr. Smith noted some degenerative changes to Mr. Stocker's finger bone. [Sep. Stmt., No. 39.] He testified at his deposition that these degenerative changes could have been due to the fact that Mr. Stocker's finger had been dislocated for over two months at that point.[5] [Sep. Stmt., No. 35.]

### B. The Unsuccessful First Surgery and Three Additional Months with a Dislocated Finger

After the May 11 surgery, Dr. Smith told Mr. Stocker that he was scheduled for a two-week follow-up appointment, however, that appointment never took place. [Sep. Stmt., No. 40.] This was disconcerting because the finger continued to cause Mr. Stocker pain, and the pins began to irritate the finger further. [Sep. Stmt., No. 42.] Mr. Stocker again started to visit the A-Yard Clinic regularly to inquire about the follow-up appointment and when the pins would be removed. [Sep. Stmt., No. 42.] *Thirty-three* days after the surgery, on June 13, Mr. Stocker filled out another Health Care Services Request Form asking for the pins to be removed. [Sep. Stmt., No. 43.]

Finally, on June 30, 2006, Mr. Stocker was taken to see Dr. Smith and he removed the pins. Dr. Smith noted that the finger was stiff, but instructed Mr. Stocker to begin range-of-motion exercises, suggesting that he squeeze a ball or wet towel. [Sep. Stmt., No. 44.] When Mr. Stocker was able to bend his finger somewhat after the surgery, he attempted to squeeze a racquetball, as instructed. [Sep. Stmt., No. 47.] On the third squeeze, however, Mr. Stocker

[5] Mr. Stocker's orthopedic expert agrees. Dr. Rosenberg states that a finger dislocation should be treated as soon as possible to avoid degenerative changes to the bone and build-up of excessive scar tissue. The reason is that bone degeneration may decrease the likelihood that a dislocation can be reduced so that it heals properly and completely. [Rosenberg Decl., p. 3, ¶ 6.]

heard and felt a large pop, and his finger immediately became extremely painful, swollen, and crooked. He concluded, correctly, that it had become dislocated again. [Sep. Stmt., No. 47.]

After the re-injury in early July, Mr. Stocker completed another Health Care Services Request Form, seeking medical assistance. [Sep. Stmt., No. 48.] His finger was causing him excruciating pain and he was unable to bend it. [Sep. Stmt., No. 48.] Mr. Stocker did not see Dr. Akanno until July 21, 2006. [Sep. Stmt., No. 49.] Contrary to Dr. Akanno's assertion that he has no control over scheduling, he insists that on this occasion, when he heard Mr. Stocker had been re-injured, "[he] saw plaintiff at the clinic immediately." [Sep. Stmt., No. 51.] However, as was typical, Dr. Akanno rushed through the appointment and seemed to be bothered that he had to deal with Mr. Stocker at all. [Sep. Stmt., Nos. 49, 68.] Dr. Akanno did not offer any medical intervention for the dislocation, but again simply referred Mr. Stocker to orthopedics. This time Dr. Akanno marked the referral as "routine," knowing full well that the result could be a two-month wait. [Sep. Stmt., No. 50.] He justified the "routine" referral this way: "There is no reason to make it urgent. With reinjury, a reinjury after such surgical procedure, it is routine procedure. It is not urgent. There is no reason to make it otherwise." [Sep. Stmt., No. 50.]

Just as Dr. Akanno had predicted would be the outcome for a "routine" referral, it took *over two months* for Mr. Stocker to be seen again by Dr. Smith – not until September 28. [Sep. Stmt., No. 55.] In the interim, Mr. Stocker pleaded with the staff in the A-Yard Clinic to get him help. His finger throbbed and began to turn purple. [Sep. Stmt., No. 53.] He had another appointment with Dr. Akanno on August 1, 2006. [Sep. Stmt., No. 52.] Dr. Akanno did nothing to expedite the orthopedic appointment, although he did prescribe a stronger pain medication for Mr. Stocker. [Sep. Stmt., No. 52.] Mr. Stocker filled out four Health Care Services Request Forms between August 18 and September 19, 2006. [Sep. Stmt., No. 53; Stocker Decl., pp. 6-7, ¶ 20 & Exhibits 7-10.] The pain was, in Mr. Stocker's words, "unbearable." [Sep. Stmt., No. 53; Stocker Decl., pp. 6-7, ¶ 20 & Exhibits 7-10.] He begged to see a doctor. [Sep. Stmt., No. 53; Stocker Decl., pp. 6-7, ¶ 20 & Exhibits 7-10.] And nothing happened.

Finally, Mr. Stocker saw Dr. Akanno again on September 22, 2006. [Sep. Stmt., No. 54.] As usual, Dr. Akanno was no help. Dr. Akanno informed Mr. Stocker on that day that his

orthopedics appointment, which had been requested *sixty-three days* earlier, was being scheduled. [Sep. Stmt., No. 52.] Again, Dr. Akanno requested a follow-up with Dr. Smith on a "routine" basis. [Sep. Stmt., No. 52.] But when Mr. Stocker finally saw Dr. Smith on September 28, nothing was done to correct the re-dislocation. [Sep. Stmt., No. 55.] Dr. Smith noted "arthritic changes" to the finger and told Mr. Stocker that he would be scheduled for the ORIF that Dr. Smith had intended to perform in May. [Sep. Stmt., No. 55.]

In the intervening weeks between the September 28 appointment with Dr. Smith and the second surgery a *month* later on October 31, Mr. Stocker's finger continued to cause him terrible pain and discomfort. [Sep. Stmt., No. 57.] Because he was unaware if or when the surgery would occur, he continued to fill out Health Care Services Request Forms asking to be seen by Dr. Akanno. [Sep. Stmt., Nos. 57-58.] He was not seen. [Sep. Stmt., No. 57.] Dr. Akanno tried to explain his utter indifference to Mr. Stocker's urgent requests for help by asserting that because Mr. Stocker had misspelled his name on the health form, writing "Acano," it was probable that Mr. Stocker was asking for someone else! [Sep. Stmt., No. 57.]

On October 31, 2006, Dr. Smith performed an ORIF on Mr. Stocker's finger. [Sep. Stmt., No. 59.] Prior to the surgery, Mr. Stocker was asked to sign a consent form indicating that the surgery could include a fusion of the bones in his finger. [Sep. Stmt., No. 60.] When Mr. Stocker discussed this possibility with the medical staff and realized that a fusion would prevent him from being able to bend the finger, he decided to withhold consent. [Sep. Stmt., No. 60.] The instructions regarding fusion were stricken from the consent form before Mr. Stocker signed it. [Sep. Stmt., No. 60.] Dr. Smith informed Mr. Stocker that he would have a follow-up appointment two weeks after the surgery, but no follow-up occurred. [Sep. Stmt., No. 61.]

### C. <u>Second Surgery Results in a Deformity, Remaining Options Not Acceptable</u>

On or about November 16, 2006, Mr. Stocker experienced severe pain in his finger when he tried to grab his soap dish while in the shower. [Sep. Stmt., No. 62.] Afterward, he went to the A-Yard Clinic to inform them that he was experiencing extreme pain, and the finger was swollen and crooked again. [Sep. Stmt., No. 63.] Mr. Stocker believed the finger had again become dislocated. [Sep. Stmt., No. 63.] An x-ray was taken on November 19, 2006. [Sep.

Stmt., No. 63.] On November 20, 2006, Mr. Stocker filled out another Health Care Services Request Form to try to get some medical attention. Mr. Stocker was in extreme pain at this time. [Sep. Stmt., No. 64.] Two days later, on November 21, Mr. Stocker saw Dr. Akanno. Again, contrary to his assertion that he has no role in scheduling inmates, Dr. Akanno apparently was able to "immediately [see] plaintiff at the clinic." [Sep. Stmt., No. 65.] Dr. Akanno gave Mr. Stocker the x-ray report which read: "Your test results are essentially within normal limits or are unchanged and no physician follow up is required." Tellingly, the words "within normal limits" had been crossed out. [Sep. Stmt., No. 65.] It must have been obvious to Dr. Akanno that Mr. Stocker's finger was not "within normal limits" then – nor is it now.

On November 28, 2006, Mr. Stocker saw Dr. Smith for the last time. [Sep. Stmt., No. 66.] During that visit, Dr. Smith noted the obvious deformity in the finger and informed Mr. Stocker that he had three options: (1) amputate the finger; (2) grind down the bones so they would lay flat and straight; or (3) fuse the finger bones together. [Sep. Stmt., No. 66.] Mr. Stocker was terrified and frustrated with these options. [Sep. Stmt., No. 66.] He certainly did not want to have his finger amputated, and Dr. Smith informed him that options (2) and (3) would result in a loss of motion in the finger. [Sep. Stmt., No. 66.] None of these were viable choices for Mr. Stocker, so he refused any additional treatment by Dr. Smith.[6] [Sep. Stmt., No. 66.] When Mr. Stocker saw Dr. Akanno for the last time on December 5, 2006, he asked whether he could see a different orthopedic surgeon for a second opinion. [Sep. Stmt., No. 67.] Dr. Akanno told him it was not possible for Mr. Stocker to get a second opinion. [Sep. Stmt., No. 67.]

To this day, Mr. Stocker's finger is permanently deformed and unusable. [Sep. Stmt., No. 69.] He still experiences pain on a regular basis. [Sep. Stmt., No. 69.] Through normal use of his hand, brushing or bumping the finger against anything causes sharp, shooting pains. [Sep.

[6] Mr. Stocker's orthopedic expert believes that the delay of over three months, between the re-injury to Mr. Stocker's finger in July and the second surgery in late October, may have prevented the second surgery from being a success because of bone degeneration and buildup of excessive scar tissue. Dr. Rosenberg opined that had the surgery been undertaken soon after the re-injury in July 2006, instead of the end of October 2006, the prospects for a full recovery would have been much greater. [Rosenberg Decl., pp. 4-5, ¶ 10.]

Stmt., No. 69.] Mr. Stocker has trouble lifting heavy objects and, because he cannot form a fist with his left had, he has trouble grasping small objects. [Sep. Stmt., No. 69.] The finger is especially painful in cold weather. [Sep. Stmt., No. 69.] It aches and turns white. [Sep. Stmt., No. 69.] Because the left ring finger is almost totally immobile, he cannot bend his pinky finger and does not have full range of motion in the three remaining fingers. [Sep. Stmt., No. 69.] He is unable to do certain jobs at the prison due to the injury, and once he is released from prison he will be similarly limited. [Sep. Stmt., No. 69.]

**D. <u>Mr. Stocker's Medical Appeal Was Delayed, Then Ultimately Denied</u>**

In or about July 2006, feeling frustrated with the lack of medical care he had received and concerned about future care, Mr. Stocker completed an Inmate/Parolee Appeal Form ("602 form"), describing the delays and ineffective treatment. [Sep. Stmt., No. 70.] Mr. Stocker heard nothing back, so he then completed a second appeal form. [Sep. Stmt., No. 71.] Again he received no response. [Sep. Stmt., No. 71.] On the third attempt, he had trouble obtaining the required "informal level" signature from staff at the A-Yard Clinic. [Sep. Stmt., No. 70.] He felt that the staff there, knowing that his treatment had been severely delayed, were unwilling to put their names on the document. [Sep. Stmt., No. 70.] Mr. Stocker finally informed the appeals coordinator that he could not get a person to sign the informal level appeal, and the appeal was accepted without that signature. [Sep. Stmt., No. 70.] The record from his appeal shows the word "BYPASS" stamped where the informal signature should go. [Sep. Stmt., No. 70.]

On September 2, 2006, Mr. Stocker filled out an Inmate Request For Interview form. [Sep. Stmt., No. 72.] He wrote: "On Aug 14, 06 I received an appeals assignment notice and the due date for my 602 was 9-7-06. However my 602 has never been heard. I wrote medical [copy is unreadable] and both times I've not got a responce [sic]." [Sep. Stmt., No. 72.] The lower section of the form included the following reply: "We don't have your appeal. Medical appeals do. They are currently backlogged at this time." [Sep. Stmt., No. 72.] Mr. Stocker filled out another Inmate Request For Interview form on September 15, 2006, informing medical staff again of the September 7, 2006 due date. [Sep. Stmt., No. 72.] He wrote, "I need this 602 heard so I can go on to the 3rd level. It concerns medical." [Sep. Stmt., No. 72.] This time, the reply was:

"Send your request to medical they have there [sic] own office. They have your appeal." [Sep. Stmt., No. 72.]

Dr. Akanno states in his declaration that he conducted the 602 appeals interview with Mr. Stocker when he saw him on September 22, 2006, and that he "discussed [his] findings and plan" with Mr. Stocker. [Akanno Decl., p. 5, ¶ 19] Mr. Stocker has no recollection of any such conversation**,** and the medical records are devoid of any such "findings" or "plan." [Sep. Stmt., No. 54.]

In late October 2006, Mr. Stocker finally received a response to the appeal he had completed in July. [Sep. Stmt., No. 73.] It was from Sharon Zamora, the Health Care Manager. [Sep. Stmt., No. 73.] He had never been contacted by anyone prior to that date to discuss his complaint. [Sep. Stmt., No. 73.] Ms. Zamora is responsible for overseeing inmates' medical appeals. [Sep. Stmt., No. 78.] In her declaration, Ms. Zamora stated that "[her] job is to administratively review the appeal to make sure that the issues raised by the inmate have been addressed by appropriate medical staff." [Sep. Stmt., No. 80.] With respect to Mr. Stocker's appeal, Ms. Zamora concluded that the appeal had been partially granted because, at the time it was completed, Mr. Stocker had an appointment scheduled with an orthopedist. Ms. Zamora's response informed Mr. Stocker that his condition was considered routine.[7] [Sep. Stmt., No. 73.]

Finally, in January 2007, Mr. Stocker received the final response to his appeal from N. Grannis, Chief of Inmate Appeals. It informed Mr. Stocker that his appeal had been denied. [Sep. Stmt., No. 74.]

Ms. Zamora also testified that she is the "warden of healthcare" with "overall responsibility for health services." [Sep. Stmt., No. 75.] She takes credit for hiring, staffing, budgets, and making sure that the Chief Medical Officer is doing his or her job. [Sep. Stmt., No. 77.] She testified that she was also ultimately responsible for all medical records. [Sep. Stmt., No. 79.] Ms. Zamora does not have a supervisor, and she testified that she supervised both the Chief Medical Officer and the Director of Nursing. [Sep. Stmt., No. 81.] Dr. Akanno testified

---

[7] When asked about policies at the prison for the handling of inmate appeals, Ms. Zamora testified in her deposition that there was no specific policy in place for handling appeals. [Sep. Stmt., No. 78.]

that the Health Care Manager was the highest authority with regard to medical care at the prison. [Sep. Stmt., No. 76.]

**III. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only where there are no disputed issues of material fact, and where the movant is clearly entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). The burden of establishing entitlement to summary judgment rests on the movant, here Defendants, with due consideration to the presumptions and burdens that characterize the issues in dispute. *Id*. at 330-32. The evidence submitted in opposition to the motion is to be credited, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine dispute is shown to exist if sufficient evidence is presented such that a reasonable finder of fact could decide the question of deliberate indifference in Mr. Stocker's favor. *See id*. at 248.

Here, there are issues of material fact as to whether Defendants were deliberately indifferent to Mr. Stocker's serious medical need. The motion should be denied.

**IV. LEGAL ARGUMENT**

**<u>Defendants Violated Mr. Stocker's Eighth Amendment Rights</u>**

A violation of the Eighth Amendment occurs where a person is subjected to cruel and unusual punishment. In the prison setting, a prisoner can prove cruel and unusual punishment under 42 U. S. C. Section 1983 where prison officials are deliberately indifferent to his serious medical needs. The Supreme Court has held that the test for an Eighth Amendment violation in this context consists of two parts:

> First, the plaintiff must show a 'serious medical need' by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong-defendant's response to the need was deliberately indifferent-is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'

*Estelle v. Gamble,* 429 U.S. 97, 104 (1976).[8]

The test has both objective and subjective components: the injury must be objectively serious such that it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The subjective component of the test requires that the prison official act with a sufficiently culpable state of mind. This prong requires "something more than mere negligence [and] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). More specifically, a prison official will be found liable under this standard where that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### A. Mr. Stocker's Dislocated Finger Represented A Sufficiently Serious Medical Need

Nowhere in Defendants' Motion for Summary Judgment have they disputed that Mr. Stocker's dislocated finger amounted to a serious medical need. Under *Estelle*, a plaintiff can show that there was a serious medical need if the plaintiff was either diagnosed as requiring treatment or if the injury is so obvious that a lay person could recognize the need for care. *See Estelle*, 429 U.S. at 104. Here, we have both. Mr. Stocker's finger was swollen, deformed and extremely painful from the day of injury on March 5, 2006 and for weeks and months thereafter, a fact made known to each of the defendants. Both Dr. Akanno and Dr. Smith immediately acknowledged the seriousness of the injury upon seeing it. Additionally, Mr. Stocker's boss at Kern Valley went easy on him because of his dislocated finger, and his floor officers let him go to the A-Yard Clinic daily to get treatment for what they recognized as an injury requiring the

[8] Defendants cite *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004), a case in which an inmate with mental illness died from a drug reaction shortly after taking illegal drugs, to argue that the threshold for a medical claim is high. However, unlike in Mr. Stocker's case, the doctor in *Toguchi* did nothing she considered to be risky and immediately responded to her patient's needs. At most, the patient was misdiagnosed. Further, although Mr. Stocker's injury must be serious, there is no requirement under the Eighth Amendment that it be fatal or near fatal in order for him to have a right to proper and timely care.

attention of a medical professional. Moreover, the Ninth Circuit has found that a fractured finger is a sufficiently serious injury under Section 1983. *See Jett v. Penner*, 439 F.3d 1091, 1096 n.1 (9th Cir. 2006). So too should this Court.

**B. <u>Dr. Akanno was Deliberately Indifferent to Mr. Stocker's Serious Medical Need</u>**

It is clear from the case law that delay, ignoring repeated requests for medical assistance, and providing blatantly inappropriate medical treatment are all sufficient facts from which to prove the deliberate indifference of a defendant.[9] *See Jett*, 439 F.3d at 1096; *see also Greeno v. Daley*, 414 F.3d 645 (7th Circuit. 2005); *Scicluna v. Wells*, 345 F.3d 441 (6th Cir. 2003).[10] All of the facts found sufficient to meet the deliberate indifference standard in these cases are present in abundance in this case.

For example, the facts in *Jett v. Penner*, where the Ninth Circuit Court reversed summary judgment in favor of the defendants, are strikingly similar to those here. In *Jett*, the plaintiff broke his thumb by falling from his cell bunk. The day of the injury, his thumb was splinted and he was given instructions from a hospital doctor to see an orthopedist early that week. For the next nearly two months he was not seen by a doctor, but submitted medical slips, wrote letters and filed a formal grievance to inform others of his need for care. The defendant prison doctor who finally saw the plaintiff approximately three months after the injury submitted a request for an orthopedics consult, but marked it "routine," and plaintiff did not see an orthopedic specialist for several months after the injury occurred. *See Jett*, 439 F.3d at 1094-96.

The Ninth Circuit reversed the district court's order granting summary judgment to

---

[9] Dr. Akanno states in his declaration that "[he] never intentionally or deliberately delayed in providing plaintiff with medical care and/or treatment." [Akanno Decl. 30] It is important to note, however, that it is not required to prove conduct was intended to harm an inmate to find a defendant liable under the deliberate indifference standard. *See Redman*, 942 F.2d at 1442 (quoting *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir.)) (holding deliberate indifference does not require intent to harm or punish).

[10] Defendants cite *McGuckin v. Medlen*, 974 F.2d 1050 (9th Cir. 1992), for the proposition that the infliction of pain by defendants must be unnecessary and wanton. In *McGuckin*, however, the Court found defendants had not inflicted such pain because they did not even have contact with the plaintiff until nearly *three years* after his injury. These facts are easily distinguishable from this case, in which Drs. Akanno and Smith knew of Mr. Stocker's injury immediately or within a few weeks.

defendants, and concluded that a jury could infer the defendant's knowledge of Jett's medical needs based upon evidence that (1) defendant had access to the initial hospital instructions and plaintiff's multiple letters and medical slips, (2) he told plaintiff he would be able to go to a follow-up appointment, and (3) defendant himself requested an orthopedic appointment. *Id.* at 1097. Further, according to the Court, evidence that the defendant did not expedite the request for care, nor indicate in his notes that the treatment the plaintiff received was ineffective, could be seen by the jury as deliberate indifference. *Id.* at 1097-98.

Dr. Akanno's indifferent and ineffective handling of Mr. Stocker's dislocated finger in this case is as egregious as the medical care in *Jett*.

**1. *Dr. Akanno's Delay Shows His Deliberate Indifference***

As noted above, delay in providing medical treatment can be used to show the deliberate indifference of a defendant. *See Jett*, 439 F.3d at 1096; *see also Scicluna v. Wells*, 345 F.3d at 446-47 (delay of 20 days creates triable issue of fact as to whether defendant was deliberately indifferent in light of serious medical need).[11] There are two periods of delay in Mr. Stocker's treatment that highlight important questions of fact regarding Dr. Akanno's deliberate indifference and that prevent entry of summary judgment: (1) The initial delay between March 5, 2006 and May 11, 2006, after Mr. Stocker first dislocated his finger; and (2) The second delay between approximately July 17, 2006 and October 31, 2006, when Mr. Stocker dislocated his finger again.

**a. The Initial Delay: March 5 through April 4, 2006**

Dr. Akanno became aware of Mr. Stocker's serious medical need the same day of the injury, March 5, 2006, when a phone call was made to him by a nurse at the prison's medical clinic with information that Mr. Stocker had dislocated his finger. Dr. Akanno telephonically prescribed Motrin – 2 doses only, at 400 mg each – and told the nurse to splint Mr. Stocker's

[11] Defendants cite to *Wood v. Housewright*, 900 F.2d 1332 (9th Cir. 1990), to argue that any delay must cause serious harm. The facts of *Wood* are easily distinguishable from Mr. Stocker's case because, despite some delay, the plaintiff in *Wood* waited less than two months total, and the delay did not affect his full recovery. By contrast, the delay in treating Mr. Stocker was the primary cause of his permanent injury. Indeed, the initial delay in even getting a doctor to examine his dislocated finger caused Mr. Stocker severe pain and discomfort – tantamount to the serious harm required by *Wood*.

finger. However, despite becoming aware of this injury on March 5, 2006, prescribing pain medication, and signing off on his telephonic order the next day, March 6, 2006, Dr. Akanno *never* followed up to determine the extent of Mr. Stocker's injury and what further medical attention he required. [Sep. Stmt., No. 12.]

Dr. Akanno testified in his deposition that at all times relevant, he worked in the A-Yard Clinic. Dr. Akanno also testified that doctors assigned to the A-Yard Clinic saw patients daily, usually in the morning and early afternoon. Mr. Stocker returned to the A-Yard Clinic on an almost daily basis between March 5, 2006 and April 4, 2006, yet Dr. Akanno took no steps to see him. This is despite the fact that Dr. Akanno admitted he sometimes saw "walk-in" patients who had not been scheduled for an appointment. Dr. Akanno's abject failure to follow up on Mr. Stocker's injury resulted in Mr. Stocker getting no prompt medical intervention for the dislocation. Plaintiff's expert stated that Dr. Akanno became Mr. Stocker's doctor on the date of the injury when he first learned of it. As his doctor, he had an affirmative duty to personally examine Mr. Stocker promptly and ensure the dislocation was reset. [Rosenberg Decl. pp.2-3, ¶¶4-5.] A jury could reasonably infer that given Dr. Akanno's knowledge of Mr. Stocker's injury and his apparent ability to see inmates without an appointment, Dr. Akanno was deliberately indifferent in failing to arrange to see Mr. Stocker at the clinic.

On March 13, 2006, when Mr. Stocker's dislocation was confirmed via x-ray, Dr. Akanno continued to do nothing to treat Mr. Stocker's finger. According to Dr. Akanno, on March 14, 2006, he prescribed Motrin for Mr. Stocker for *90 days, doubling the strength of the dosage,* despite the fact that he had not even evaluated Mr. Stocker's dislocation and determined the need for stronger paid medication. According to Plaintiff's expert, given the existence of a dislocation, Dr. Akanno had an obligation to promptly examine Mr. Stocker to determine the status of the injury before issuing more and stronger pain medication. [Rosenberg Decl. pp. 3-4, ¶ 8.] From these facts, a jury could find that Dr. Akanno was deliberately indifferent in failing to examine Mr. Stocker or review his medical file before issuing the new prescription. On March 30, 2006, Mr. Stocker filled out Health Services Request Forms pleading that someone reset his finger, however, this did not result in getting Dr. Akanno's attention or that of any of the medical staff at

the A-Yard Clinic.

Finally, on April 4, 2006 – a full month after his injury occurred – Mr. Stocker saw Dr. Akanno for the first time. Dr. Akanno apparently did not make any inquiry about the x-ray taken on March 13, as there is no evidence that he saw it. And, Dr. Akanno did not order an x-ray, but simply concluded Mr. Stocker's finger was fractured. [Sep. Stmt., No. 28.] It is impossible to arrive at such a diagnosis without the benefit of an x-ray. [Rosenberg Decl., p.3, ¶ 5.] Further, it had taken Dr. Akanno a full month to see Mr. Stocker regarding his dislocated finger despite (1) Dr. Akanno's knowledge of the dislocation on the day it occurred, March 5, (2) Mr. Stocker's visits to the A-Yard Clinic, where Dr. Akanno worked daily, requesting that someone reset his finger, (3) the dislocation being confirmed by x-ray on March 13, (4) Dr. Akanno being notified that Mr. Stocker was in continued pain and prescribing a doubled strength of Motrin for 90 days on March 14, and (5) Mr. Stocker filling out a Health Services Request Form on March 30 pleading for someone to reset his finger. Surely a finding of deliberate indifference could be drawn by the jury from some or all of these facts.

During the April 4, 2006 appointment, Dr. Akanno merely looked at Mr. Stocker's finger and did not attempt to reset it; rather he informed Mr. Stocker that he would request an appointment with an orthopedic surgeon. The initial delay does not end here.

For the next three weeks, between April 4, 2006 and April 25, 2006, Mr. Stocker continued to frequently return to the A-Yard Clinic to check on the status of his orthopedic appointment and to inform the A-Yard Clinic staff of the worsening pain in his finger. Mr. Stocker also filled out three additional Requests for Health Care Services on April 18, 2006, April 19, 2006 and April 20, 2006. Notwithstanding Mr. Stocker's pleas for help, he did not see Dr. Akanno again until April 25, 2006. At that appointment, Dr. Akanno did not attempt to reset or straighten Mr. Stocker's finger, although he confirmed the dislocation by reviewing for the first time the x-ray report from March 13.

Mr. Stocker's first appointment with an orthopedic surgeon, Dr. Smith, was on April 27, 2006, almost *two months* after the dislocation occurred. Thus, just as in *Jett*, Mr. Stocker was made to wait months for medical intervention, submitting requests for care in vain, while the

doctor neglected his duty to follow through on the care that was so obviously needed, and of which he was plainly aware. These facts must be viewed in a light most favorable to Mr. Stocker. A reasonable jury could certainly find that Dr. Akanno had knowledge of the injury and was deliberately indifferent. There is without a doubt a question of fact as to Dr. Akanno's deliberate indifference based only on this initial delay. Nevertheless, there is a second – even longer – delay in Mr. Stocker's treatment that must be discussed.

**b. The Second Delay: July 17 through October 31, 2006**

After Mr. Stocker's May 11 surgery, there was no follow up appointment, as promised, and the pins that had been placed in Mr. Stocker's finger bothered him. Finally, on June 30, 2006, Dr. Smith saw Mr. Stocker to remove the pins, instructing him to begin range-of-motion exercises. Shortly thereafter, sometime before July 17, 2006, Mr. Stocker re-dislocated his finger while squeezing a racket ball as directed. An x-ray taken soon after this date confirmed that Mr. Stocker's finger was re-dislocated. Mr. Stocker saw Dr. Akanno on July 21, 2006, and informed him of the re-injury. At that time, Dr. Akanno again did not attempt to reset the finger, but instead made a "*routine*" referral request for Mr. Stocker to see Dr. Smith. [Akanno Decl., p. 4 ¶ 17 & Exhibit A, MED 00157] Dr. Akanno made this request routine despite knowing that a routine request for an orthopedics consultation could take two months or more. [Sep. Stmt., No. 50.] Making this type of "routine" request in the face of a serious medical condition is precisely the type of action that has been found to constitute deliberate indifference by the Ninth Circuit. *See Jett*, 439 F.3d at 1097-98. The indifference is even more pronounced here, as Dr. Akanno knew that making a "routine" request would likely result in Mr. Stocker not being seen for months.

A delay of over two months is exactly what happened. Because Dr. Akanno requested a "routine" appointment with Dr. Smith, Mr. Stocker did not see him until September 28, 2006, approximately *seventy-four days* after the re-dislocation. Mr. Stocker saw Dr. Akanno again on August 1, 2006, and Dr. Akanno did nothing to expedite Mr. Stocker's appointment despite the fact that Mr. Stocker complained of the severe pain he was in. By his own admission, Dr. Akanno stated that an appointment can be expedited by following up with the Utilization

Management Nurse at the CTC. [Sep. Stmt., No. 51.] Mr. Stocker filled out Health Care Services Request Forms on August 18, 2006, September 10, 2006, September 14, 2006 and September 19, 2006. He reported that his hand was turning purple. Yet, nothing happened. On September 22, 2006, Mr. Stocker finally saw Dr. Akanno again. At this time Dr. Akanno informed Mr. Stocker that he had an appointment with Dr. Smith on September 28.[12] Mr. Stocker finally had surgery to correct the re-injury on October 31, 2006 – well over three months after the re-injury occurred.

In summary, these two periods of unconscionable delay create a triable issue of material fact as to whether Dr. Akanno was deliberately indifferent to Mr. Stocker's serious medical need, and they prevent the entry of summary judgment in Defendants' favor. Dr. Akanno cannot simply pass the blame to unnamed persons and state that he is not responsible for the "actual" scheduling of appointments. A doctor has a solemn duty to take affirmative steps to follow up and treat his patients. [Rosenberg Decl., p.3, ¶ 5.] Mr. Stocker became Dr. Akanno's patient the day he was injured and Dr. Akanno became aware of the possible dislocation, and most certainly after he gave telephonic instructions to provide a splint and Motrin to Mr. Stocker. [Rosenberg Decl., p. 3, ¶ 5.] The reasons are obvious.

*First*, Dr. Akanno admits that he has some control over when to see patients. For example, Dr. Akanno states in his declaration that on July 21, 2006, he became aware of Mr. Stocker's re-injury and saw him "immediately" that same day. [Akanno Decl., p.4, ¶ 17.] Dr. Akanno should have done the same to follow-up with Mr. Stocker on all the other occasions Mr. Stocker was begging for medical assistance, starting with the very day after Mr. Stocker was injured. Additionally, although Dr. Akanno does not schedule outside appointments himself, he certainly has control over expediting these appointments, either by making them "urgent" or "emergent," or by following up with the Utilization Management Nurse once a request is made. Dr. Akanno did nothing to expedite Mr. Stocker's appointment with Dr. Smith after the re-

[12] Despite Dr. Akanno's claim that the September 22, 2006 appointment served as an interview session in which he investigated the claims of Mr. Stocker's 602 appeal, Dr. Akanno did not discuss Mr. Stocker's appeal at this appointment. [Akanno Decl., p.5, ¶ 19; Sep. Stmt., No. 54.]

dislocation by making the request "routine."

*Second*, Dr. Akanno did nothing to treat or follow up with Mr. Stocker, and now hides behind the age-old excuse that someone else is responsible. Dr. Akanno should have done more to see that Mr. Stocker was seen promptly by the orthopedic surgeon, and should have ensured his patient was getting the proper medical treatment—this was his affirmative obligation as a physician and as Mr. Stocker's doctor. He ignored both obligations, acting with indifference to medical needs he knew to exist and which he had the power to address.

**c. Dr. Akanno's Delays Caused Serious Harm to Mr. Stocker**

There is a serious harm caused by Dr. Akanno's delay in responding to Mr. Stocker's medical emergency. Not only did Mr. Stocker have to endure months of pain and suffering, but also the three-month delay between Mr. Stocker's re-injury in early July 2006 and his surgery in late October 2006 created the necessity to perform an open reduction and internal fixation. Had he been treated immediately in early July, it is likely that another closed reduction could have been performed and the pins put back in place. This would have made a full recovery for Mr. Stocker much more likely without the need for him to undergo general anesthesia or an additional surgery. [Rosenberg Decl., pp. 4-5, ¶ 10.] Additionally, according to the testimony of Dr. Smith, Mr. Stocker probably sustained additional degenerative changes on his finger in the two months between his second dislocation in early July and when he was seen by Dr. Smith in September. [Smith Depo 93:14]. Mr. Stocker's expert agrees. [Rosenberg Decl., pp. 4-5, ¶ 10.]

Based on the above-described delays, a reasonable jury could find Dr. Akanno to have been deliberately indifferent to Mr. Stocker's serious medical need.

***2. Dr. Akanno's Blatantly Inappropriate Treatment Shows His Deliberate Indifference***

Defendants argue that because Dr. Akanno saw Mr. Stocker a number of times he was not deliberately indifferent. However, Dr. Akanno did *nothing* to treat Mr. Stocker's dislocation during any of the appointments. Dr. Akanno merely continued to provide Motrin at ever-increasing strengths, and then the powerful pain medicine, Vicodin. He also provided splints and tape, but he himself admits that a dislocated finger needs to be reset, not just splinted, as soon as

possible. Providing a patient with blatantly inappropriate treatment, notwithstanding the number of times a patient is seen by a doctor, is an additional way of proving deliberate indifference. *See Greeno*, 414 F.3d at 654 ("the defendants' contention that Greeno's claim fails because he received *some* treatment overlooks the possibility that the treatment Greeno did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition"); *see also Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir.1994) (finding "[a] jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] situation").[13]

Dr. Akanno admits that it is the best practice to reset a dislocated finger as soon as possible after the injury.[14] Nevertheless, instead of ensuring that Mr. Stocker's finger be immediately re-set, Dr. Akanno directed a nurse to splint Mr. Stocker's dislocated finger and to provide him with Motrin. Dr. Akanno did not once attempt to reset Mr. Stocker's finger even though he has admitted that *he has reset dislocated fingers in the past*. Instead of following up with his patient and attempting to reset his finger right away, Dr. Akanno let Mr. Stocker's finger remain dislocated for over two months after the initial injury, and for over three months after the finger was re-dislocated. In light of these indisputable facts, viewed most favorably for Mr. Stocker, and the established case law, a reasonable jury could find Dr. Akanno's treatment to be blatantly inappropriate and thus find Dr. Akanno to have been deliberately indifferent.

### 3. *Dr. Akanno's Decision to Ignore Mr. Stocker's Repeated Requests Shows His Deliberate Indifference*

"To prevail on an Eighth Amendment claim 'a prisoner *is not* required to show that he was literally ignored.'" *See Greeno*, 414 F.3d at 654 (emphasis added). However, evidence that Dr. Akanno was aware of Mr. Stocker's repeated requests for medical treatment and failed to

[13] Defendants cite *Jackson v. McIntosh*, 90 F.3d 330 (9th Cir. 1996), for the proposition that a mere difference in medical opinion is not deliberate indifference. However, Defendants cannot argue that a two-month delay in care, followed by a three-month delay in care, was simply what Defendants thought to be appropriate. It was blatantly inappropriate.

[14] Dr. Smith also admits that a dislocated finger should be reset as soon as possible after a dislocation. [Sep. Stmt., No. 10.]

respond to those requests is evidence of deliberate indifference. This was the same conclusion reached by the Ninth Circuit in *Jett*:

> Mr. Jett is entitled to an inference that Dr. Penner was aware of the filed grievance, medical slips, and aftercare instructions in his medical record. Accordingly, the trier of fact could find, prior to December 24, 2001, Dr. Penner was aware of Mr. Jett's need for aftercare for his fractured thumb and that Dr. Penner's failure to see Mr. Jett to ensure the fracture was set and cast was deliberate indifference to a serious medical condition.

*Jett*, 439 F.3d at 1097.

Mr. Stocker filled out Health Care Services Requests Forms on twelve different occasions between March 5, 2006 and October 31, 2006. [Sep. Stmt., Nos. 24, 42, 53; Stocker Decl., p. 3, ¶ 7 & Exhibits 1-11, 13, 15-16.] According to Dr. Akanno's testimony, these documents usually get placed in a patient's medical file after they are filled out. Dr. Akanno also stated that it is his practice to try to review a patient's medical file before he sees the patient if it is available, and that both doctors and nurses review the medical files. Furthermore, Mr. Stocker saw Dr. Akanno with Mr. Stocker's Health Care Services Request Form on at least one occasion. For purposes of this summary judgment motion the facts must be viewed in Mr. Stocker's favor. Mr. Stocker is entitled to an inference that Dr. Akanno was aware of Mr. Stocker's numerous and insistent requests for medical services. *See Id.* ("As the party opposing the motion for summary judgment, Mr. Jett is entitled to an inference that Dr. Penner was aware of the filed grievance, medical slips, and aftercare instructions in his medical record."). Therefore, a reasonably jury could conclude that Dr. Akanno was aware of Mr. Stocker's repeated requests for medical attention yet failed to either reset the dislocated finger himself or expedite his appointments.

For all these reasons, summary judgment should be denied as to Dr. Akanno.

**C. Dr. Smith was Deliberately Indifferent to Mr. Stocker's Serious Medical Need**

Dr. Smith became aware of Mr. Stocker's serious medical need on April 27, 2006, when he first met with Mr. Stocker and observed the dislocated finger. A question of fact exists as to whether Dr. Smith was deliberately indifferent to Mr. Stocker's serious medical need because, as Mr. Stocker's physician, Dr. Smith had a duty to follow-up with Mr. Stocker and ensure that he was seen in a timely manner. Dr. Smith's delay in making follow-up appointments with Mr.

Stocker, specifically after the initial surgery on May 11, 2006, amounts to deliberate indifference. Additionally, a question of fact exists as to whether Dr. Smith provided blatantly inappropriate treatment when he (1) did not attempt to reset Mr. Stocker's finger immediately on April 27, 2006, by way of a closed reduction, and (2) failed to order physical therapy for Mr. Stocker once he removed the pins from his finger after his initial surgery on May 11, 2006.

### 1. *Dr. Smith's Delay in Following-Up With Mr. Stocker Shows His Deliberate Indifference*

As noted above, a delay in providing treatment is relevant to proving a defendant's deliberate indifference. *See Jett*, 439 F.3d at 1096; *see also Scicluna*, 345 F.3d at 446-47 (delay of 20 days created triable issue of fact as to whether defendant was deliberately indifferent in light of serious medical need). Dr. Smith first performed a closed reduction procedure on Mr. Stocker's finger on May 11, 2006. After the procedure, Dr. Smith made a note in his file that Mr. Stocker should have a follow-up appointment within two weeks. Mr. Stocker never had that follow-up appointment. Rather, the next time Dr. Smith saw Mr. Stocker was on June 30, 2006, a month late, when he removed the pins from Mr. Stocker's finger. A question of fact exists as to whether Dr. Smith has control over when a patient is scheduled for an appointment. Dr. Smith has admitted that if he wants to see a patient back, he writes an order for a nurse to set the patient for an appointment. Additionally, Dr. Smith admits that on occasion he has and is able to make a phone call to a scheduling nurse to expedite an appointment. Thus, it appears that Dr. Smith has some control over when a patient is scheduled for an appointment. Furthermore, once Dr. Smith removed the pins from Mr. Stocker's finger and noted that he should begin range of motion exercises, he did not request a follow-up appointment or attempt to see Mr. Stocker at all. The next time Dr. Smith saw Mr. Stocker was on September 28, 2006, *two months after* his finger became re-dislocated while squeezing a racket ball as Dr. Smith had instructed. Dr. Smith was aware of the re-injury to Mr. Stocker's finger because Dr. Akanno had submitted a referral request on July 21, 2006. Dr. Smith did not correct the re-injury until October 31, 2006 – over three months from when the re-injury occurred.

**a. Dr. Smith's Delays Caused Serious Harm to Mr. Stocker**

All of the aforementioned delays caused harm to Mr. Stocker. According to Dr. Smith's own testimony, Mr. Stocker probably sustained additional degenerative changes on his finger in the two months between his second dislocation and when he was seen by Dr. Smith in September 2006. [Sep. Stmt., No. 56.] Furthermore, as noted above, had Mr. Stocker been treated immediately in early July after his re-dislocation, it is likely that another closed reduction could have been performed and the pins put back in place. This would have made a full recovery for Mr. Stocker much more likely, without the need for Mr. Stocker to undergo general anesthesia or surgery. [Rosenberg Decl., pp. 4-5, ¶ 10.]

These inexcusable delays create a genuine issue of material fact as to whether Dr. Smith was deliberately indifferent to Mr. Stocker's serious medical need.

***2. Dr. Smith's Blatantly Inappropriate Treatment Shows His Deliberate Indifference***

Providing a patient with blatantly inappropriate treatment can amount to deliberate indifference. Additionally, a jury can infer deliberate indifference from a defendant doctor prescribing treatment that he or she knows to be ineffective. *See Greeno*, 414 F.3d at 654 ("the defendants' contention that Greeno's claim fails because he received *some* treatment overlooks the possibility that the treatment Greeno did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition"). *See also, Hathaway*, 37 F.3d at 68 (finding "[a] jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] situation").[15]

There are several facts that could lead a reasonable jury to determine that Dr. Smith provided blatantly inappropriate treatment, and is therefore liable under Section 1983. *First*, Dr.

[15] Again, the deliberate indifference standard does not require that Dr. Smith intended to harm Mr. Stocker. *See Redman*, 942 F.2d at 1442 (*quoting Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir.)) (holding deliberate indifference does not require intent to punish). Accordingly, Dr. Smith's statements that he did not intentionally or deliberately delay in providing medical care to Mr. Stocker and that he did not intend to cause him harm are irrelevant. [Smith Decl., p.5, ¶ 11]

Smith admits that a dislocated finger should be reset as soon as possible after a dislocation.[16] However, Dr. Smith did not attempt to reset Mr. Stocker's finger when he first met with him on April 27, 2006. Instead, additional delay ensued.

*Second*, Dr. Smith did not perform an open reduction and internal fixation on May 11, 2006 at all. Dr. Smith testified that it is preferable to attempt a closed reduction in lieu of a surgical procedure. However, Dr. Smith put Mr. Stocker under general anesthesia – which carries its own risk of complications – and ended up performing the closed reduction procedure that plainly did not require such invasive measures. Dr. Smith should have first attempted the closed reduction using local anesthesia.

*Third*, Dr. Smith failed to order physical therapy for Mr. Stocker after removing the pins from Mr. Stocker's finger in June of 2006, despite making notes in his file that Mr. Stocker should begin range of motion exercises and despite admitting in his deposition that physical therapy and range of motion exercises would make it more likely for a patient with a dislocated finger to make a full recovery. [Sep. Stmt., No. 45.] Dr. Smith also acknowledged that Corcoran State Prison has facilities for physical therapy for inmates, but he failed to request that Mr. Stocker be given physical therapy there. [Sep. Stmt., No. 46.]

All of the above create a genuine issue of material fact as to whether Dr. Smith was deliberately indifferent to Mr. Stocker's serious medical needs by providing blatantly inappropriate treatment. Interpreting the facts in Mr. Stocker's favor, a jury could find that Dr. Smith understood the risk of harm to Mr. Stocker, had the ability to help expedite and enhance his treatment, and utterly failed to do so.

For all these reasons, summary judgment should be denied as to Dr. Smith.

### D. Ms. Zamora was Deliberately Indifferent to Stocker's Serious Medical Need

Sharon Zamora is, in her own words, "the warden of healthcare." During 2006, she was responsible for the healthcare policies in place at Kern Valley and for supervising the "clinical"

[16] Defendants cite *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003), for the proposition that defendants must be aware of the risk of harm to the plaintiff. The court in *Lolli* found defendants were aware of the risk based on circumstantial evidence. Here, we have an even stronger case, as Defendants admitted they were aware of the harm that could come to a dislocated finger if not reset quickly.

personnel who were directly responsible for providing care to Mr. Stocker. Failure at the supervisory level to set effective policy or to properly manage persons directly committing constitutional violations amounts to deliberate indifference under the Eighth Amendment. *See Redman v. County of San Diego*, 942 F.2d 1435, 1443-44 (9th Cir. 1991). Further, Ms. Zamora was directly responsible for medical appeals. The facts suggest that Mr. Stocker's appeal was delayed and that proper protocols were not followed in this process, amounting to deliberate indifference on her part to respond to Mr. Stocker's pressing medical needs.

**1. *Ms. Zamora's Failed Policies Show Her Deliberate Indifference***

Supervisors can be liable, even without personal or direct participation in the harm, if they are responsible for implementing a policy "so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *See Redman*, 942 F.2d at 1446. *See also Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (citing *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987)) (supervisors are liable where there exists either (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between supervisor's wrongful conduct and constitutional deprivation). Thus, the fact that Ms. Zamora had no personal contact with Mr. Stocker in no way precludes her from liability. In her sworn deposition, Ms. Zamora claimed that the "overall responsibility of the health services program at Kern Valley" was hers. She herself did not have a supervisor on site, and she supervised both the Chief Medical Officer and the Director of Nursing. Dr. Akanno recognized the Health Care Manager as the ultimate person responsible for medical care at Kern Valley. From these facts, a reasonable jury is likely to conclude that she was in charge, and could further conclude that as the person in charge, she "acquiesced in a deficient policy that was a moving force" behind the violation of Mr. Stocker's right to timely and adequate medical care. *See Redman*, 942 F.2d at 1447-48.

Ms. Zamora stresses the fact that she does not have medical training as a way of attempting to convince the Court to overlook her liability for the supervisory failures that hampered the timely provision of medical care to Mr. Stocker. Any layperson understands that medical care must be provided in a timely manner. Issues of scheduling and the flow of

paperwork do not require medical knowledge, but they are critical to proper care. In one breath Ms. Zamora claims authority over what sounds like sweeping responsibility for medical services and staffing at Kern Valley. In the next, she disclaims knowledge of the logistical systems within the clinics there. This is an issue of fact that can only be resolved by a jury at trial.

### 2. *Ms. Zamora's Tacit Authorization of a Custom Tolerant of Inadequate Medical Care Shows Her Deliberate Indifference*

Even without a written policy in place, prison officials may be liable "if the constitutional deprivation was visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." *See Redman*, 942 F.2d at 1444 (internal quotations omitted). Mr. Stocker does not argue that Ms. Zamora approved a written policy urging nurses not to schedule patients or urging doctors not to see them. On the contrary, Mr. Stocker argues that there was no policy—or no adequate policy—in place to ensure that his urgent medical needs were met. The truth is that no one took responsibility for ensuring that a dislocation be treated immediately or, at most, within a couple of days. Instead, despite almost daily visits to the A-Yard Clinic where Dr. Akanno is the duty doctor, Mr. Stocker's finger was not treated for sixty-seven days. He was scheduled for an x-ray, but no doctor was there to analyze it, and Dr. Akanno did not bother to do so when he prescribed a stronger dose of Motrin two weeks after the injury first occurred. Mr. Stocker was later made to wait again: he waited nearly two months with his second dislocation to be consulted by an orthopedist, and nearly three months to actually be treated for it. Not only is Mr. Stocker left with a permanent disability in the form of a disfigured and immobile finger which affects his entire hand, but he was also made to suffer month after month of tremendous pain without treatment. Ms. Zamora states that she never "intentionally or knowingly cause[d] plaintiff to suffer any pain, harm, or injury, or cause[d] any delay in his treatment." [Zamora Decl., p.3, ¶ 4]. Yet, as a prison official with the power to affect policy, Ms. Zamora does not need to have direct knowledge or intent to be found to be deliberately indifferent. *See Redman*, 942 F.2d at 1442 (*quoting Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir.)) (holding deliberate indifference does not require intent to punish). The very fact that Mr. Stocker was not treated for a simple dislocation

for sixty-six days speaks volumes for the so-called policies in place at Kern Valley. This "conduct was so reckless as to be tantamount to a desire to inflict harm." *See Redman*, 942 F.2d at 1449.

Mr. Stocker filled out twelve Health Care Services Request Forms between his injury and his last surgery. In each, he discussed the severe and ongoing pain he was experiencing. Those forms disappeared temporarily or were ignored during the time period in question. Dr. Akanno does not remember seeing them in Mr. Stocker's file. Dr. Akanno also testified at his deposition that he was not made aware of the complaints raised in the Health Care Services Request Forms. He has very limited knowledge about whether there is a policy in place for ensuring that the forms are processed in a timely manner so that inmates with serious medical issues will be seen promptly; he knew more about "loose filing" than about the protocol for scheduling patients. Ms. Zamora stated in her deposition that "[she] supervise[s] medical records". It would thus be reasonable to infer that she approved of this custom of allowing serious medical requests to go unheeded, or knew of it and did nothing. Mr. Stocker himself is unaware of where the Health Care Services Request Forms went once he filled them out. A reasonable jury could infer, based on Dr. Akanno's testimony about the "loose filing" system, that these important inmate communications sat—sometimes for months—before they made their way to Mr. Stocker's file. As Dr. Smith explained to Mr. Stocker, by then it was too late. "A reasonable jury could find that these policies or customs or both exacerbated the danger posed…to such an extent that they amounted to deliberate indifference to [Mr. Stocker's injury], thus constituting a violation of § 1983." *See Redman*, 942 F.2d at 1445. Ms. Zamora's authorization of a custom that promoted delay and unresponsiveness to inmate's medical needs shows her deliberate indifference to Mr. Stocker.

#### 3. *Ms. Zamora's Failure to Train Her Subordinates Shows Her Deliberate Indifference*

Policy makers can be liable if those in contact with the inmate violate the inmate's rights because they were not properly trained. If "the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights . . . the policy makers . . .

can reasonably be said to have been deliberately indifferent to the need." *See Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). *See also Plemmons v. Roberts*, 439 F.3d 818, 824 (8th Cir. 2006) (failure to train employees to recognize serious medical need can show deliberate indifference). "A factfinder may find that the policymakers and supervisors were on actual or constructive notice of the need to train." *See Clement*, 298 F.3d at 905 (internal quotations omitted). Ms. Zamora admits that she had responsibility during the relevant time period for management, hiring, budgets, staffing, and ensuring that clinical staff show up to work on time, thus she cannot now say that she was unaware that there was no doctor available to treat Mr. Stocker's initially routine injury or that the personnel, over whom she acknowledges her supervisory responsibilities, were not acting responsibly to schedule or see Mr. Stocker before so many days and weeks had elapsed. Under the reasoning of *Redman*, a reasonable jury could find that Ms. Zamora was deliberately indifferent to Mr. Stocker's rights by failing to ensure that the staffing was adequate to handle the number of urgent medical requests that the prison was responsible for handling. A jury may also conclude that the doctors', nurses', and nursing supervisors' failure to provide Mr. Stocker with adequate and timely treatment was due to inadequate training on the part of their supervisor, Ms. Zamora.

#### 4. *Ms. Zamora's Failure to Ensure that Mr. Stocker's Appeal was Handled in a Timely Manner Shows Her Deliberate Indifference*

*Finally*, supervisors are liable if they know of a constitutional violation and fail to act. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (summary judgment for defendant on basis of lack of personal participation improper where defendant was alleged to have prevented law books from reaching plaintiff). Aside from her liability as a supervisor, Ms. Zamora also had direct involvement in handling Mr. Stocker's appeal. She admits that she is directly responsible for appeals, stating that "[her] job is to administratively review the appeal to make sure that the issues raised by the inmate have been addressed by appropriate medical staff." Yet, she never checked to see if Dr. Akanno had interviewed Mr. Stocker regarding his inmate appeal, as required. Nor did she ensure that the appeal was processed in a timely manner. Although the due

date for the appeal was September 7, 2006, Mr. Stocker did not receive a response until October 24, 2006. Ms. Zamora admitted there was no policy of which she was aware related to appeals. A reasonable jury could conclude, especially based on the debilitating nature of Mr. Stocker's injury and his urgent need for care, that this amounts to deliberate indifference.

In sum, Ms. Zamora is deliberately indifferent both through the policy she created or tacitly authorized, or the lack of policy, and for her intentional delay in processing the appeal through which Mr. Stocker was attempting to ensure adequate care. Thus, summary judgment should be denied as to Ms. Zamora.

## V. CONCLUSION

For all the foregoing reasons, Mr. Stocker respectfully requests the Court to deny Defendants' Motion for Summary Judgment in its entirety.

Dated: February 17, 2009

JONES DAY

By:/s/ Yolanda Orozco
Yolanda Orozco

Attorneys for Defendant
JOHNIE L. STOCKER

**PROOF OF SERVICE**

I, Angelina E. Chew, declare:

I am a citizen of the United States and employed in Los Angeles, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 555 S. Flower Street, 50th Floor, Los Angeles, California 90071. On February 17, 2009, I served a copy of the within document(s):

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

☒ by electronic transmission. I am familiar with the United States District Court, Eastern District of California's practice for collecting and processing electronic filings. Under that practice, documents are electronically filed with the court. The court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document. Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities. Under said practice, the following CM/ECF users were served:

Alberto Gonzalez
Alberto.Gonzalez@doj.ca.gov
Jill Buttram Scally
Jill.Scally@doj.ca.gov
Dottie Macken
Dottie.macken@doj.ca.gov
Emily Larkin
Emily.Larkin@doj.ca.gov
Inez Crawford
Inez.Crawford@doj.ca.gov
Jim Schaivenza
Jim.Schiavenza@doj.ca.gov
TORT-ECF@doj.ca.gov

/s/ Angelina E. Chew

LAI-3002932v7